[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for the termination of parental rights of Dawn W. and Michael R., the unmarried, biological parents of Destiny R. The petition was initiated by the Department of Children and Families (DCF) on April 18, 1996. The petition alleges that the mother has consented to termination of her parental rights with respect to the child. The petition further alleges that the father Michael R. (1) has abandoned the child; (2) has been found in a prior proceeding to have neglected the child and has failed to rehabilitate himself; (3) that the child has been denied by reason of acts of commission or omission the care, guidance or control necessary for the child's physical, educational, moral or emotional well being; and (4) that there is no ongoing parent-child relationship between the father and the child as that concept is defined by General Statute § 17a-112. The petition further alleges that the one year requirement for the grounds to have existed prior to the petition should be waived under the totality of the circumstances surrounding the child to promote the best interests of the child.
The trial of this case occurred over three days beginning November 12, 1996. Fifteen exhibits were admitted into evidence, including psychological reports and social studies, and numerous witnesses testified.
Factual Findings
The evidence indicates that Destiny was born on November 10, 1994 and the very next day a referral was made to DCF from the Veterans Memorial Medical Center because of the mother's long and extensive history of mental and emotional instability which could interfere with her ability to effectively parent her child and CT Page 9592 keep the child safe from harm. The testimony of the social worker and the social study filed in support of the termination of parental rights (Petitioner's Exhibit 9) reflect numerous calls, reports, and visits to the various places of residence of Dawn W. and Michael R. In the four months that Destiny was in the custody of her mother and father, the parents moved four times. DCF provided a parent aide, visiting nurses and a psychiatric social worker to assist the family in parenting for Destiny. During that period, the various care providers and support services personnel made referrals to DCF concerning the inappropriate care provided by Dawn and bruises and injuries to Destiny. Both Dawn and Michael denied that they caused any harm to the child and each reported that the wounds to this four month old child were self-inflicted. On March 30, 1995, after observing serious bruises to the child, DCF obtained an order of temporary custody. The child has been in the custody of the Commissioner of DCF since that time.
On May 31, 1995, David M. Mantell, Ph.D., evaluated Dawn W. and Michael R. pursuant to an order for psychological evaluation. Both Dawn and Michael denied that they hit the child and maintained that the child accidentally injured herself. Dawn told Dr. Mantell that the child had been removed from her care because the child was having "too many accidents, that she fell off of the bed, hit herself in the side of the face pulling on keys, and that the last straw was when the child hit her face on the crib."
The foster parents were brought in as part of the evaluation of Destiny. They reported to Dr. Mantell that when the child was first brought in to foster care on March 31, 1995 the child was depressed and unhappy; the child was ravenously hungry; the child had two black eyes and a hematoma on her left ear, she was underweight; she did not sleep at night and she whimpered a lot.
Dr. Mantell first tested Michael's reading comprehension and determined that Michael did not understand what he had read. Michael reported that he was able to read at a sixth grade reading level. Dr. Mantell learned that Michael had learning disabilities and had been a special education student in school. Other psychological tests placed Michael in a borderline range. He is not sure of his own paternity, but if his father is the man whose name he bears, then he has five other siblings with exactly the same name, though all have different mothers! He himself was "in and out of State homes" as a child, including the Waterford Country School and the State Receiving Home. Michael reported to CT Page 9593 Dr. Mantell that he was "unable to count the numbers of times he has been arrested and that he cannot remember them all." He said these arrests have been for "petty stuff and are misdemeanors." He reports he has never been to jail.
 I asked what he was arrested for. He replied, "a five-finger discount." I asked what that is and he said it was for shoplifting and that he is now on probation for fraud. He said this is Welfare fraud since they said he collected in two towns and has to pay back $497.00. I asked what the other misdemeanors were and he was evasive calling them petty stuff and explaining "you go to Court and [a] judge slaps your hand."
(Dr. Mantell's report, Petitioner's Exhibit 7, p. 3)
After first telling Dr. Mantell he had no other children, Michael later reported that he had a prior relationship and has a male child by that relationship, which child he sees "once in a while." He is willing to terminate his parental rights to that child.
During the interview with Dr. Mantell, neither parent admitted to any knowledge of abuse of Destiny and both parties indicated their interpersonal relationship was "wonderful." Both statements were untrue. Within six months, their relationship was over and Michael had courted and married his present wife, Cindy R. Within one year of their interview with Dr. Mantell, the mother, Dawn, telephoned DCF social worker Christine Reguin. According to the social study "Dawn informed this worker that she had been having flashbacks of repressed memories. She admitted to having been the perpetrator of each incident of physical abuse inflicted upon Destiny. She reported she had hit Destiny in the face with a baby bottle, had thrown her off the bed, and had bruised her because she picked her up wrong. She further indicated that Michael R. was aware of these incidents and did nothing about them."
The social worker thereafter made a home visit to Michael R. and confronted Michael with the information she had received from the child's mother. Michael admitted to having known about the bruises; he had also witnessed Dawn slap Destiny on the face on at least two occasions, had witnessed Dawn picking up Destiny inappropriately and was aware that Destiny would spend the majority of her day strapped into the child's seat with her arms CT Page 9594 strapped down. Michael did nothing about this treatment, nor did he intervene to protect Destiny. A parent has an affirmative obligation to keep their children safe. Michael did not.
Both Michael and Dawn had deliberately misstated the facts to the psychologist during the interview of May 31, 1995. Dr. Mantell also noted that Michael was an unreliable reporter about many central matters of his personal history. He provided contradictory and misleading information.
Information subsequently obtained from other sources includes the fact that Michael has a felony conviction for burglary in the third degree which was reduced from burglary in the second degree with a firearm (Gen. Stat. § 53a-102a). That charge was pending against Michael when he had the interview with Dr. Mantell. It was not disclosed. He is on probation until August 22, 1998. Further, Michael is reportedly in arrears $5,500 for child support for his son Matthew, which may account for his willingness to allow his parental rights to be terminated. His performance at work indicates an inability to hold an entry-level job for more than a few months at a time. His history reflects frequent unemployment and short term employment.
Michael married Cindy M. on November 11, 1995. Since his marriage Michael has made some efforts to comply with court expectations and comply with his visitation schedule. Destiny was removed from her parents on March 30, 1995. Michael visited Destiny with Dawn in April, May and June. He was given the foster parents' phone number, the social worker's phone number and the Careline number. Between June 18, 1995 and December 1, 1995, Michael had no contact with the child. It was only after his relationship was established with his present wife, Cindy, that Michael took a more active interest in Destiny. He visited almost as often as permitted during the first half of 1996. In the past three months he has missed eight out of fifteen visits. The quality of his visits with Destiny is of questionable value to either Michael or Destiny. Dr. Mantell indicated that no parent-child relationship exists. He describes Michael's relationship with the child as "peripheral" while Destiny was in the home with Dawn during the first four months of her life. After the child was removed from the home, Michael didn't see the child for a substantial period of time. Since he has resumed visitation, Dr. Mantell sees Michael's relationship with Destiny as that of an interesting playmate and "the child is more interested in the visitation environment than in him." CT Page 9595
During the court hearing of June 27, 1995, the court set expectations for Destiny's parents. The parents were to attend parenting classes, attend individual therapy, and visit the child as often as permitted by DCF.
 Both parents are presenting with less than average intellectual endowment, substantial problems of judgment, features of emotional disturbance, and apparent relationship difficulty though they emphasize how strongly they are attached to one another. Both have exceedingly problematic family of origin experiences, have known repeated disruptions in their lives, and have been exposed to much trauma as well as abuse. The parents are presenting with little insight regarding themselves, each other, and the condition of their child. They do not recognize any need for service.
. . .
 The parents should be referred out for out-patient counseling in order to reidentify the significant stressors in their family of origin and adolescent experiences which have led to their emotional problems and their emotional control difficulty. Therapy with the parents will need to be very concrete. It will then need to be blended with extensive parent education programming. The mother will have to be monitored for her affective disturbance, by history, and both parents for problems of anger management and low frustration tolerance.
(Dr. Mantell's report, Petitioner's Exhibit 7, pp. 7-8.)
Michael has not completed individual therapy nor an anger management course that was recommended by Dr. Mantell. He has completed a parenting class as required by the expectations. Regrettably, DCF does not set forth any standards regarding the content or duration of such programs. Neither does DCF appear to have an approved list of such courses. By any standard, the class that Michael attended has not produced any noticeable change in his parenting skills during visitation. Neither counsel nor DCF social workers made any detailed inquiry into the nature and substance of the class Michael attended.
During his in-court testimony Michael indicated that his plan for the care of Destiny is to quit work to take care of her in CT Page 9596 the event the child was placed in his custody. Apparently he expects his wife to support him and this child from his prior relationship. Since his present wife did not testify, the court was unable to determine if she knows of his plan. This plan is inconsistent with Dr. Mantell's observations that Michael is an inadequate caretaker in terms of his responsiveness to the child's needs. "He leaves the caretaking responsibilities to females or the person with whom he is living."
In his report of July 8, 1996 (Petitioner's Exhibit 8), Dr. Mantell summarizes the relationship of Michael and Cindy as follows:
 The father and stepmother present in a defensive and immature fashion. Their reliability as personal historians is questionable and their assertions should all be externally verified. The father appears dependent, well meaning, and inadequate. His personal and family histories are dysfunctional and his own behavior carries antisocial features. The stepmother was so defensive that meaningful evaluation of her was hard to pursue. She is often tangential/marginal in her statements. A tension is observed in the marital relationship with the stepmother acting as a spokesperson for herself and the father and also engaging him in a strongly directive fashion. (p. 9.)
In his testimony Dr. Mantell characterized the interaction between Michael and Cindy as her being "bossy," always telling him what to do. "The two trade insults in ways that are uncomfortable to those around them." Dr. Mantell further observed that Destiny had no interest in Cindy and that during the interaction with the child, the father chased around after Destiny and the step-mother traced around after the father.
ADJUDICATION
The court finds from the foregoing facts by clear and convincing evidence that Destiny has previously been adjudicated a neglected child. Since the adjudication of neglect, the father has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, he could assume a responsible position in the life of Destiny, in violation of General Statute § 17a-112(b)(2). The court concludes that the one-year requirement for this ground to have existed should be CT Page 9597 waived under the totality of circumstances surrounding the child, to promote the best interests of the child.
The court further finds by clear and convincing evidence, undisputed at the time of trial, that Destiny has been denied, by reason of acts of commission or omission by the father, the care, guidance or control necessary for Destiny's physical well-being. The father, Michael, was aware that this child was receiving injuries and bruises on numerous occasions in her first four months of life, as well as inadequate care and inappropriate treatment, and the father failed to intervene to protect the child. In view of Michael's dependent personality and his subservient role in his present relationship, the court cannot conclude that he would be able to properly protect the child in the future. The court finds that this ground has existed for more than one year.
The evidence fails to support the claim by DCF that the respondent Michael R. has abandoned the minor child. That ground is dismissed.
The petitioner has failed to prove that there is no on-going relationship with the child. In Re Valerie D., 223 Conn. 492
(1992). This ground is dismissed.
The mother, Dawn W., has signed a consent to terminate her parental rights. This consent has been accepted by the court.
DISPOSITION
It is not sufficient to find that grounds for termination exist. The court must also determine pursuant to General Statute § 17a-112(d), as amended, if a termination of parental rights is in the best interest of the child. The court must make this finding by clear and convincing evidence. Practice Book Sec. 1050.1(3). The court must also consider the following statutory criteria:
1) Regarding the nature and timeliness of services offered by the DCF, the court finds that appropriate, timely services were provided by the DCF including individual counseling, case management, visitation assistance and parenting classes. Prior to placement, the services included a parent aide, Visiting Nurses Association, a psychiatric social worker and a referral for family preservation. CT Page 9598
2) Regarding the efforts of reunification pursuant to the Federal Adoption Assistance and Child Welfare Act of 1980, the court finds by clear and convincing evidence that the DCF has made reasonable efforts, given the circumstances and situation, to reunite the family. Prior to placement, DCF offered the services described in paragraph (1) above. Since placement, DCF offered to coordinate individual counseling for Michael, but he did not follow through on the counseling. DCF offered him weekly visitation, including transportation to the visits or reimbursement for his mileage. They coordinated the time, date and place for the visits. Michael failed to have any contact for about six months, and recently has been making only every other visit. The quality of the visits has not progressed beyond that of a friendly playmate.
3) Regarding court orders for fulfillment of obligations, expectations, service agreements and the like:
DCF, with the approval of the court, set reasonable and realistic expectations, as have previously been described. There has been irregular compliance with respect to the most important expectation of regularly visiting the child to maintain a relationship with the child. Michael's absence from the child's life from age six months to one year seriously contributed to the loss of any parent-child relationship. In addition, an expectation was established which required individual counseling. Although it is clear from Dr. Mantell's reports that Michael was in need of such services, Michael never appreciated the need nor followed through with the counseling.
4) Regarding significant emotional ties of the child toward parents, relatives and foster parents:
The social study and Dr. Mantell's report indicate that the child continues to be in foster care and appears to be doing very well, in that the child is comfortable, happy, well-cared for and is meeting her developmental milestones. The child's relationship with Michael and the step-mother has been discussed earlier.
5) Finding regarding the age of the child: Destiny was born on November 10, 1994 and is now two years of age. The child requires a stable home where she can be placed, where she will be safe and free from abuse or neglect. Destiny needs understanding, acceptance, patience and a secure home. CT Page 9599
6) Regarding the father's efforts to conform his conduct to the best interests of the child considering contact, conduct, communications and contributions, if any: The court finds that while Michael has made some efforts to conform to the expectations, he has failed to maintain his parent-child relationship with Destiny and has failed to undertake the in-depth, concrete individual counseling which would be necessary to bring his performance as a parent within acceptable standards significant to make it in the best interests of the child to be reunited with her.
7) Finding regarding the prevention of the father's having a meaningful relationship with the child: The court finds that DCF provided visitation services as previously described. The court finds that there was no impediment placed in his path.
Further, the court is mindful of the overwhelming policy in support of requiring parents to financially support their children. In re Bruce R., 234 Conn. 194 (1995). There has been no showing in this case that the father has ever obeyed a child support order for either of his children. The termination of his parental rights will only free Destiny for possible adoption by parents who will support her.
ORDER
The court, having considered all statutory considerations and having found by clear and convincing evidence that grounds exist for termination of parental rights, further finds upon all of the facts and circumstances presented that it is in the child's best interest to terminate the parental rights of Dawn W., by her consent, and to terminate the parental rights of Michael R. for the reasons previously expressed. Accordingly, it is ordered that their parental rights in and to Destiny R. are hereby terminated. It is further ordered that the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for the purpose of securing an adoptive family or other permanent placement for said child and that the Commissioner shall file with the Superior Court for Juvenile Matters no later than 90 days following the date of judgment a written report toward such permanent placement, and file such her reports as are required by state and federal law.
FOLEY, J. CT Page 9600